## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRIGID A. FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 1:15-cv-1989-WTL-DML |
| | ) | |
| MARION COUNTY SHERIFF'S | ) | |
| DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT AND RELATED MOTIONS

This case is before the Court on the Defendants' motion for summary judgment (Dkt. No.

47). The motion is fully briefed and the Court, being duly advised, **GRANTS IN PART AND**

**DENIES IN PART** the motion for the reasons set forth below. The Court also **GRANTS** the

Plaintiff's motion to file a surreply (Dkt. No. 102) and **directs the Clerk** to file the surreply

(found at Dkt. No. 102-1). The Court **DENIES** the Plaintiff's Verified Motion for Rule 56(d)

Relief (Dkt. No. 108) because none of the additional discovery the Plaintiff seeks would be

material to the Court's analysis of the instant motion.[1] Finally, the Court **GRANTS** the

Plaintiff's motion to file an oversized brief (Dkt. No. 133) and **directs the Clerk** to file the

amended response to the motion for summary judgment (found at Dkt. No. 133-1).

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[1]The other motions relating to that discovery have been referred to the Magistrate Judge
for resolution.

entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the

admissible evidence presented by the non-moving party must be believed,[2] and all reasonable

inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th

Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor."). However, a party who bears the burden of proof

on a particular issue may not rest on her pleadings, but must show what evidence she has that

there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*,

325 F.3d 892, 901 (7th Cir. 2003). Particularly relevant in this case,[3] the non-moving party bears

the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment."

*Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001). Finally, to the extent that the Plaintiff

has included citations to evidence in her "timeline" exhibit that she did not cite to in her already

oversized response brief or her surreply, the Court has not considered that additional evidence.

*See* Local Rule 56-1.

---

[2]Ford's statement in her surreply that "all of Ford's facts **must** be accepted as true," Dkt. No. 102-1 at 5 (emphasis in original), is simply incorrect. Rather, only those facts that are properly supported by evidence (or more specifically, materials in the record that can "be presented in a form that would be admissible in evidence") are properly considered. Fed. R. Civ. P. 56(c).

[3]The Court notes that the Plaintiff submitted a number of exhibits that are not referred to in her briefs. The Court is under no obligation to "'root through the hundreds of documents and thousands of pages that make up the record here to make [Ford's] case for [her]'" and declines to do so. *See Rahn v. Bd. of Trustees of N. Illinois Univ.*, 803 F.3d 285, 294 (7th Cir. 2015) (quoting *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir. 2004) and citing *Friend v. Valley View Community Unit School Dist. 365U*, 789 F.3d 707, 710-11 (7th Cir. 2015); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in the briefs."). It is counsel's obligation to cite to the relevant evidence and explain how that evidence supports each argument.

## II. BACKGROUND

The relevant[4] facts of record, viewed in the light most favorable to the Plaintiff, as the non-moving party, are as follow.

Plaintiff Brigid Ford began working full-time as a deputy for the Marion County Sheriff's Office ("MCSO") in 2003, having previously worked as a reserve officer.[5]  In 2008, she began working as a sworn deputy sheriff in the warrants unit of the special investigations section of the criminal division of the MCSO.

***Ford's Disability***

On April 18, 2012, Ford was injured in a car accident.  She returned to work on "limited duty" status on April 25, 2012.  Until January 19, 2013, she conducted research and fulfilled other duties in the criminal warrants unit.  She was then transferred to the Marion County Jail, where she monitored security cameras.  Ford continued to receive her full deputy's salary while she was on light duty.

In March and April 2013, Ford's treating physician provided the MCSO with documentation showing that Ford had permanent restrictions due to reflex sympathetic dystrophy ("RSD") and a permanent injury to her dominant right hand.  On May 10, 2013, Ford was sent for a fitness for duty exam and placed on administrative leave with pay pending the outcome.

---

[4]The Plaintiff's response brief substantially exceeds the applicable page limit.  A great portion of the extra space is taken up with wholly irrelevant facts.  For example, the Defendants' obligations to Ford under the Americans with Disabilities Act would be the same whether her disability was caused by an on-the-job injury that was "no fault of her own"—a fact that is mentioned no fewer than four times in the oversized brief—or by an act of her own negligence that occurred on her own time.  Similarly, the fact that Ford received the Detective of the Month award fifteen years ago as a reserve officer is simply irrelevant to the issues before the Court.

[5]The entity for which Ford works previously was called the Marion County Sheriff's Department, which is the name used by Ford in her complaint.  At some point it changed its name to the Marion County Sheriff's Office.

Dr. Stephen Moffatt performed the fitness for duty exam and reviewed Ford's job position and her medical records. On June 7, 2013, Dr. Moffatt reported his conclusion that Ford could not perform the duties of a deputy sheriff due to a permanent injury to Ford's right hand that prevented her from carrying a firearm, an essential function of the deputy sheriff position.[6]

On June 19, 2013, Human Resources Director and EEO Officer Angela Grider, Chief Deputy Eva Talley-Sanders, and Colonel Louis Dezelan met with Ford and informed her of Dr. Moffatt's conclusion. After a review of various open civilian positions, they offered Ford the opportunity to move to an open civilian position as a main control clerk earning significantly less pay (a decrease in base salary of $11,647.86), resign, or be terminated. They also gave Ford a document summarizing those options and a draft letter of resignation dated that day. Ford asked if she could think about it, and they agreed. When Ford asked whether there were any other open civilian positions, she was told that the main control clerk position was the only one "where we are able to meet the limitations of your request." Dkt. No. 70-18 at 3.

The following day, Ford sent the following email to Grider:

I need some more time before I make any decisions about my status with the MCSO. I want to work. I think that if the department is able to make some reasonable accommodations for my complex regional pain syndrome and restrictions I may be able to work in Main Control. I already have an appointment scheduled with my family physician on Tuesday, June 25th. Please forward the ADA form that he would need to fill out to me, and I will see if he can do that. I also want to make sure that whatever decision I make does not negatively affect my claim against workers comp.

---

[6]There is no dispute that Ford was physically unable to perform the duties of a deputy sheriff. *See* Dkt. No. 49-2 at 7 (Ford Dep. at 80:6-16) ("I know that my hand was sufficiently damaged that I wasn't going to be able to carry a gun or even a radio any longer, and my overriding pain disorder would make it difficult for me, if not impossible, to be a deputy sheriff.").

Dkt. No. 70-11 at 1.  Ford's request for an accommodation was the first that Grider and Talley-

Sanders had dealt with at the MCSO.  Five days later, on June 25, 2013, Grider replied to Ford:

> I am not sure what specific form you are requesting?  However, I have spoken
> with the Chief Deputy and she has indicated that you may postpone your decision
> regarding the offer for Civilian Status/Main Control Clerk position until you have
> had an opportunity to consult with your treating physician.  Please indicate in
> writing what the accommodations you are requesting and forward to me no later
> than the close of business, Thursday, June 27, 2013.

*Id.*  Ford responded the same day:

> I don't know if there is a name for a form that I need from the department.  I was
> told to ask for the "ADA form."  I spoke to my hand surgeon's assistant and she
> said that the employer provides the form so that he can review it.  I have left her
> another message to see if she has a specific name for the document.
>
> As I said before, I want to work.  I do not want to resign, and I am aware that at
> this time the department does not have any other position available for me.  As we
> discussed, the job of main control clerk is primarily answering the phones and
> looking up information, and it involves a great deal of repetitive motion.  I am not
> comfortable making a medical decision about how that can or cannot be modified
> to suit my needs.  My hand surgeon is at the Back to Work Center on Wednesday
> afternoon only.  And he will not be in the office next week (July 3) due to the
> holiday.  As I said earlier, I left a message for his assistant earlier today.  As soon
> as I hear back from her I will let you know.

Dkt. No. 70-12 at 1.[7]  On June 28, 2013, Ford emailed Grider and asked her if she had spoken

with her hand surgeon's assistant.  She also indicated that she had found "a generic ADA form

on the Department of Labor's website," and asked whether the MCSO had "a policy on

accommodating ADA issues."  She further suggested that "[m]aybe if we put our heads together

---

[7]In her statement of facts, Ford notes that during this time period "Grider did not engage
in any discussions with Ford about what she could or could not do," and "MCSO did not offer
Ford any suggestions or assistance."  Dkt. No. 133-1 at 13-14.  It is not clear to the Court how
Ford believes Grider or the MCSO could or should have done so at that point.  Ford herself
indicated that she did not feel comfortable discussing what accommodations she needed without
speaking with her hand surgeon, who was unavailable.  Surely Ford is not suggesting that the
ADA requires an employer to force an employee to engage in a discussion which the employee
stated she was not comfortable having without additional medical advice.

we can come up with something that will satisfy all of us." Dkt. No. 70-14 at 2. Grider responded the same day:

> I did receive a voicemail message which indicated that she would have the doctor review upon his return July 8, 2013. There was nothing she could tell me directly and would have to have the doctor call you once he reviews.
>
> Again, the MCSO does not have an ADA form to be completed. We simply need something from you in writing with the requested accommodation.

*Id.* Ford responded by asking what the surgeon was reviewing, to which Grider responded "I can only assume the job description you provided for the position and his previous notes regarding your status/progress following treatment he provided? You would be better to ask that question to the nurse for certain though." *Id.*

On July 11, 2013, Grider sent Ford the following email: "To follow up to our phone conversations this morning at 830 am [sic], regarding a request for accommodation for the Main Control Clerk position that was offered to you on June 19, 2013; it is imperative that we receive your written request for accommodations no later than the close of business, Friday, July 12, 2013." The next day, Ford hand delivered a letter to the MCSO that explained that her hand surgeon had "placed the limitations of no repetitive motion, no twisting or gripping, and weight restricted to no more than two pounds." Dkt. No. 70-15 at 1. She further explained that she had helped out in main control while she was on light duty and "the job as it is currently exacerbates my complex regional pain syndrome and is outside the scope of my limitations," but that "I think that if the department were to provide some reasonable accommodations, I might be able to do that job." *Id.* She explained that "[t]he specific job functions that would be difficult for me in their present form are answer the phone, looking up information, pressing the door buttons to let people into and out of the jail, and the overall noise of the environment." *Id.* Ford requested the following accommodations, explaining, in detail, why she needed each one: a headset or hands-

free phone, a voice-activated software system, an ergonomic work station, an ergonomic chair, sensitivity training for her supervisors regarding her disability, and the ability to take breaks and stand and walk when needed. She also asked for "periodic reviews" of her situation "to see if improvement could be made." *Id.* at 2.

In a letter dated September 16, 2013, Grider responded to Ford's accommodations request and asked Ford to contact her no later than September 27, 2013, to "address these issues." Dkt. No. 70-17. The letter stated that the MCSO would "purchase a reasonably priced ergonomic chair and work station, and a headset or hands-free phone" and would "provide training to supervisors regarding [her] condition." *Id.* The MCSO further agreed to make reasonable efforts to allow Ford to take breaks as necessary. The MCSO did not agree to provide Ford with a voice-activated system because Grider was informed that the programs used in the position were not technologically compatible with the available voice activated systems. Other employees at the MCSO used voice-activated systems at the time.[8]

On Friday, September 20, 2013, Ford emailed Grider and asked whether the position she had been offered—Main Control Clerk, second shift—was the only open civilian position at the

---

[8]In her statement of facts, Ford states that "aside from pricing quotes, Grider conducted no further research [with regard to Ford's requested accommodations] other than providing Ford with job descriptions at Ford's request." Dkt. No. 133-1 at 14-15. As the Defendants correctly point out, that statement ignores the fact that—in the testimony cited by Ford—Grider testified that she also "got with the ISA office as far as seeing if we could accommodate a headset or an automated system when answering the phones." Dkt. No. 75-9 at 8. It is baffling that Ford claims in her surreply that it is the *Defendants* who make a material misrepresentation with regard to this issue. *See* Dkt. No. 102-1 at 7. Even more baffling is the fact that Ford chastises the Defendants for pointing out that DOE 74 was not included in Ford's designation of evidence and accuses the Defendants of "ignor[ing] Ms. Ford's correction of a scrivener's error in a citation and again argued that a particular exhibit did not exist," Dkt. No. 129 at 10, but the correction Ford cites to was of **an entirely different** citation in her brief (DOE 71-72 and 98-100, not DOE 74) that related to a different issue and was **ten pages later** in Ford's response brief.

MCSO. Grider replied that it was "the only position where we are able to meet the limitations of your request." Ford responded by again asking what other positions were open, commenting that "[m]aybe there is something else that I can do where the Department would not have to make all those accommodations." Grider responded on Monday, September 23rd: "The Main Control Clerk position is the only available position that we are able to offer you given your limitations," and "if you are unable to accept this position, we will need to separate your employment from this agency." Ford responded the following day by again asking whether the MCSO had a policy regarding the ADA (apparently not having received an answer when she asked on June 28th) and then stating:

> Please provide me with a list of open civilian positions. I believe that under ADA open positions are to be offered based on qualifications, not limitations. Your response to my request for that information on Friday stated that the only available position "given your limitations" is in Main Control, yet that position is primarily one of typing, which is outside the scope of my medical restrictions.

Dkt. No. 70-18 at 2. Having received no response, on September 27, 2013, Ford emailed Grider and stated: "Although I have concerns about my ability to do the job of Main Control Clerk without some type of accommodation to reduce/minimize the typing, I do want to work. When will I start in Main Control?" *Id.* at 1. Grider responded by directing Ford to report to work on Monday, September 30th. She further stated: "Because you are now returning to work in the Main Control position, I am assuming that your pending requests regarding other possible assignments is now a moot issue. Please contact me if you have any questions or concerns."[9] *Id.*

---

[9]Ford includes the following statement in her statement of facts: "Grider believed that once Ford was 'placed in a position where [the MCSO deemed] she was accommodated,' MCSO's requirements under the ADA were totally fulfilled. (DOE 222 at 168–170)." The cited deposition testimony does not support that statement. The questioning on the pages cited dealt with whether Grider considered whether Ford could perform the job of criminal analyst when such a position opened two years after Ford returned to work. Her testimony clearly indicates that she did not believe the MCSO was required to continue to look for other positions for Ford

When she reported to work on September 30, 2013, Grider told Ford that she would be given a week to observe positions in the book-out process and visitation process to determine whether she could perform them. During this week, on October 3rd, Ford met with Grider and "broke down into tears" while explaining that she did not know if she could work with Carol Ladd, an employee in the visitation area, calling Ladd a "bully." According to Grider's memo to herself memorializing the conversation, Ford "stated that Carol's strong personality along with her not providing what she felt would be adequate information regarding the job duties and that she was not sensitive to her disability made her feel stressed which would initiate pain in her arm and wrist." Dkt. No. 71-24. Grider "informed Ford that she should take another day in Visitation to see if she possibly wanted to work in this area as it is a position we could make adjustments that were agreed upon." *Id.* According to Grider's memo:

> Ms. Ford again stated that she wasn't sure she could deal with the pressure and stress that she felt Ms. Ladd had made her feel since she wasn't "moving fast enough" and felt she wasn't going to get along with Ladd. I again stated that we can accommodate as we had communicated in the past, but the personality conflict is something that would need to be brought to management's attention and she would not be treated any differently than others in her permanently assigned unit. Ms. Ford agreed to give it another day and stated she would let me know tomorrow if she would take the position or not.

*Id.*

Ford ultimately accepted the position as a visitation clerk. As promised, the MCSO provided Ford with an ergonomic work station, a telephone headset, an ergonomic chair, and the opportunity to take breaks as necessary. Additionally, Ford's supervisor in visitation, Lieutenant James Walterman, would frequently allow Ford to leave early—using her leave time—if she was experiencing a lot of pain.

---

once she was placed in a position that she could perform with the accommodations she was given, but that is not the same as believing that their "requirements under the ADA were totally fulfilled."

*Ford's Experience as a Visitation Clerk*

On Ford's first day as a visitation clerk, her co-worker Carol Ladd asked her if she was going to stay in that job. When Ford responded that it depended on whether certain accommodations could be made for her, Ladd "said words to the effect of I'm smart, I went to college, I studied human resources, I know the law, and they don't have to make any accommodations for you." Dkt. No. 75-8 at 12. Ford "immediately got up and walked and reported that conversation to Ms. Grider." *Id.* Ford completed her shift with Ladd that day and did not have any other conversations with her regarding Ford's disability or accommodations.

Ford's trouble with Ladd continued and later, when employee Eva Watts began working as a visitation clerk, she joined Ladd in harassing Ford on a daily basis.[10] Pursuant to MCSO procedure, which stated that "if any employee has any type of disagreement or conflict, etc., with any employee of MCSO . . . a supervisor shall be contacted," Dkt. No. 72-2 at 13, Ford informed her supervisor, Lieutenant James Walterman, of Ladd and Watts's offensive behavior toward her over twelve times between October 2013 and December 2014.

On February 1, 2014, Ford emailed Lieutenant James Walterman to complain about Ladd not acknowledging her when Ford spoke to her. The email relates a lengthy story regarding an event that had occurred that morning that Ford characterized as showing Ladd's animosity

---

[10]In her statement of facts, Ford states that "[t]rue to Ford's fears, Ladd consistently and repeatedly made negative, insulting remarks *about Ford's disability*" and "Watts also joined Ladd in daily harassing Ford *about her disability*." Dkt. No. 133-1 at 16, 17. The evidence cited to supports the proposition that Ford was subjected to daily harassment from Ladd and Watts, but it does not support the assertion that the daily harassment was about Ford's disability. *See* Ford's Declaration, Dkt. No. 75-14 at ¶ 12 ("Ms. Watts joined Ms. Ladd in harassing me daily."); Ford's deposition testimony at 136, Dkt. No. 75-8 at 14 (testifying that Ladd harassed her on a "frequent and ongoing" basis); Walterman deposition at 29, Dkt. No. 75-13 at 4 (simply stating that he received "complaints or grievances" from Ford about Ladd, Watts, and Hendricks without characterizing their nature or frequency); Plaintiff's Designation of Evidence 36-50, Dkt. Nos. 71-4 through 71-18 (each of which is summarized in the Court's fact section).

toward Ford. She stated that "I am trying very hard not to let this stuff get to me, but it really causes me pain to have to deal with this animosity. I know you said that you would deal with it next week, and if necessary I will take a break or do whatever I need to do to keep the peace today." Dkt. No. 71-4. The next day, Ford emailed Walterman to report that "the rest of Saturday was pretty uneventful" but that Ladd, while on a personal phone call in the work area Ford and Ladd shared, had said to the person on the phone that "she was tired of these people who pretend that they are disabled just so they can get special treatment." Dkt. No. 71-5.[11]

On March 13, 2014, Ford sent a lengthy memorandum to Walterman in which she detailed the following objectionable behavior by Ladd toward her that had occurred over the course of that day: (1) Ladd making many unspecified "snide remarks"; (2) Ladd commenting to Watts, whom Ford was training, that if Ladd "did not wait until her computer shut down '[Ford] will read everything on it'"; (3) when Ford mentioned to another employee that Ladd had made fresh coffee, Ladd "made a remark to the effect that she was a nice person who just did things like that"; (4) as reported to Ford by Watts, Ladd "shashayed [sic] her hips on out of here" after Ford passed along work-related information to Ladd; (5) Ladd making comments about how Ford was performing her job (such as leaving callers on hold too long); and (6) Ladd speaking to her while she was on work calls. Ford reported to Walterman that Sergeant Johnson had

---

[11]In her statement of facts, Ford cites to this email as evidence that "Ford informed Walterman that Ladd *often* commented to Ford that she "was tired of these people who pretend they are disabled just so that they can get special treatment." Dkt. No. 133-1 at 17 (emphasis added). This email discusses only one instance of Ladd making that particular comment, and not to Ford, but to someone on the phone; in fact, Ford stated in the email that "she may have been talking about someone else but given the comments that she has made before and her continuing (though intermittent) use of the speaker phone when we are making appointments I can't help but take these comments personally." Dkt. No. 71-5.

"attempted to mediate the situation" and that Ladd had left the office and refused to listen when it was Ford's turn to speak. The memo concluded:

> Lt., as I have said before, the situation began when I came into the section. Ms. Ladd told me on my first day that the department did not have to make accommodations for me due to my disability. She was aggressive about it, and told me that she knows the law and that MCSO does not have to make any accommodations for me. I spoke to Angela Grider about that and was told that it was a management issue. I have had her push chairs into me, put her music on speaker while I was scheduling appointments, put her phone on speaker while I was scheduling appointments, tell me to "be quiet" while I was talking to the Sgt., tell me to "keep your opinions to yourself," and many, many other hostile acts. I respectfully request that the situation be addressed. Thank you for your patience and assistance.

Dkt. No. 71-6. Walterman sat down with Ford and Ladd and discussed the situation, after which the situation improved for a couple weeks, but then Ladd resumed her hostile acts. For example, Ladd would put her phone on speaker while Ford was scheduling appointments and push a chair into Ford. In an email dated April 24, 2014, Ford reported to Walterman that "Ladd is creating a hostile work environment and she is making it miserable for me during the hours that she is here. Sgt. Johnson has spoken to her about the comments that she is making, but she is continuing to do it in spite of being talked to by you and Sgt. Johnson." Ford asked that the situation be addressed by Walterman again. Dkt. No. 71-7. Walterman met with Ford and Ladd many times to discuss the situation.

Per MCSO policy, in March 2014, Ford submitted documentation to the MCSO regarding a change in her pain medication. The MCSO sent Ford's job description and her reported medication list to Dr. Moffatt for his evaluation of whether it would inhibit her ability to do the job safely. Dr. Moffatt determined that Ford should not take the medication within eight hours

of reporting to work.  Based on Dr. Moffatt's determination, the MCSO informed Ford that she could not take the medication within eight hours of reporting to work.[12]

On April 30, 2014, Ford emailed Walterman and related an incident in which Watts had created a scene when Ford had informed her that she could not take certain training materials home with her.  Dkt. No. 71-8.

On May 10, 2014, Ford emailed Walterman to share some observations regarding mistakes that had been made with visitation scheduling.  Dkt. No. 71-10.

On June 21, 2014, Ford emailed Walterman again documenting visitation scheduling mistakes that had been made.  She also thanked Walterman for "letting me leave Thursday," which was "a very bad pain day" that was made worse by the fact that Ladd and Watts "kept the phones on speaker."  Dkt. No. 71-11.   A few days later,[13] she forwarded an email exchange to Walterman in which she had told Ladd and Watts that she "could not figure out what you did, so rather than messing it up further I opted for letting you guys fix it" and Ladd had replied "[f]igure it out."  Dkt. No. 71-12.

---

[12]In 2016, the MCSO asked Dr. Moffatt to re-evaluate Ford's medication use.  Based on his review, "including the fact that Ford had taken the medication for over a year and was able to tolerate it in the performance of her duties," Dr. Moffatt concluded that Ford could take the medication within eight hours of starting her shift.  Dr. Moffatt reported this conclusion to the MCSO.  Ford inexplicably moves to strike Dr. Moffatt's declaration as improper expert testimony.  It is not, and cannot reasonably be construed as such.  It simply sets forth the facts relating to actions Dr. Moffatt took relating to Ford.  Ford's argument to the contrary is nonsensical.  Dr. Moffatt's declaration is not "*classic* expert testimony relating to causation." Dkt. No. 102-1 at 9 (emphasis in original).  Indeed, it is unclear to the Court what Ford is referring to by the word "causation" in that sentence. The "causation" of Dr. Moffatt's own recommendation to the MCSO?  If so, Dr. Moffatt is certainly entitled to testify about the reason he made his recommendation to the MCSO—that reason is fact testimony—*i.e.*, it is a fact that Dr. Moffatt made that determination for that reason.

[13]The Court believes this is the written report to Walterman that Ford refers to as occurring on June 22, 2014; it is actually dated June 24, 2014.

On July 8, 2014, Ford emailed Walterman and complained that Ladd did not respond when Ford said good morning to her, and that Ladd said that Ford's yogurt smelled "like vomit and was making her sick." Dkt. No. 71-13. On July 23, 2014, Ladd remarked in Ford's presence that "people who claim to have medical problems often have mental disabilities and need to get medication for that instead of expecting everybody else to deal with their so-called medical problems." Dkt. No. 75-8 at 17. Following that comment, Ford sent Walterman an email that read: "The remark was made a short time ago by Carol Ladd that people need to get help instead of expecting everyone else to deal with their medical problems. I take that personally as a slight against my disability. I am going to try to ignore her for the rest of the day, but I am understandably upset." Dkt. No. 71-14.[14] On July 30, 2014, Ford emailed Walterman and reported the following:

> Shortly after she arrived this morning, Carol slammed her chair into me. It hit me hard enough to push me several inches. I got up and said "that hurt. I'm tired of you slamming your chair into me. The next time that you do it I'm going to file an EEO complaint against you." Deputy Shephard was in the room when it happened as well as Eva. I don't think either of them saw it, but they certainly heard it. I am in a lot of pain right now, and I am not sure that I will be able to

---

[14]As Ford correctly notes in her surreply, the Defendants incorrectly assert that this statement of fact is not supported by the cited evidence. Ford requests in her surreply that the Court "remind counsel for MCSO of their obligations of candor to the Court." In light of the numerous inaccurate citations to the record by Ford in her response brief, noted throughout this fact section, it appears that perhaps counsel for both sides would have benefitted from a more careful review of the evidence cited. Further, it is ironic that Ford calls out the Defendants for "inappropriate use of hyperbole and exaggeration" when Ford's briefs are littered with the same. For example, the Defendants' reply brief contains the following footnote: "Plaintiff named both the City of Indianapolis and the Marion County Sheriff's Office as defendants. However, her only employer was the MCSO and all of the relevant decision-makers were MCSO officials. Thus, the MCSO is the only proper party to this action. For purposes of this reply, counsel will refer only to the MCSO as the sole Defendant. However, any argument presented in this reply applies with equal force to the City of Indianapolis." Dkt. No. 88 at 1. In her surreply, Ford characterizes that footnote as "a prime example of Defendants' improper attempts to discredit counsel for Ms. Ford." Dkt. No. 102-1 at 3 n. 1. Hopefully simply reading the preceding sentences is enough to demonstrate to Ford's counsel that their own footnote is a prime example of their own inappropriate use of hyperbole and exaggeration.

work the rest of the day.  Please do something about this.  It is becoming a huge issue.

Dkt. No. 71-15.  A few minutes later, she emailed Walterman the following:

> Also, just so you know, when I came back in to the room, Carol and Eva had switched seats.  Carol was sitting there telling Eva that she "was not going to be attacked."  Deputy Stinson was in there while she was talking.  She continued on, talking about having the bad computer now, etc.  She got up saying that she was going to leave to take care of her tire. She then walked out.

Dkt. No. 71-16.

> A few weeks later, on August 21, 2014, Ford sent the following email to Walterman:

> I put those forms on your desk.  I am leaving now.  Just FYI, on Tuesday, I said something to Carol three times about her bumping into me.  She and Eva just laughed about it.  Dep. Johnson saw most of the incidents, and by the fifth time, I no longer said anything.  Just now, she did the pulling the chair out and hitting me again with it act that is starting to become routine.  I know that you have addressed this issue, but I'm a little mad about it.  I got up and left the room without saying anything to her.  When I came back, she and Eva were both gone. Thanks for letting me leave early, and I'll see you tomorrow morning.

Dkt. No. 71-17.

> On November 11, 2014, Ford sent the following email to Walterman:

> Just FYI, I just spent the last ten minutes listening to Carol and Eva say things about me that are unacceptable.  They are accusing me of being a "bully" when it comes to scheduling.  Carol stated that some visitor is the only one on an inmate's list and that I am blocking the visitor from visiting.  She showed Eva an e-mail about it.  There was also an incident last week where a visitor came in with a large, hooded sweatshirt on.  The female has a piece of medical equipment and I allowed her to wear her sweatshirt.  She said that she had spoken to the other clerk (I'm guessing Carol) and was told that we would all be notified about her situation.  Obviously no one was told. She was also told that she could visit twice, that she is the only adult on the visitor's list.  That is also not correct.

> Today my chair had been adjusted so that the bottom was tilted forward.  Also, my ringer was turned off on my phone.  The handset of the phone was unplugged, not enough so that you could see it, but enough so that when you tried to use it, it wouldn't work.  I have no idea who did this, but this is getting old.  Deputy Johnson said that she tried to use my phone also, but it wouldn't work.

Dkt. No. 71-18.

On December 9, 2014,[15] Ford sent Walterman another memorandum regarding Ladd and Watts.  In the memorandum, Ford complained about the following:  (1) Ladd bumping into Ford twice, "once while putting her coat on, and once while standing in the office" on December 4, 2014; (2) comments made to a jail visitor on the same day by Ladd about she and Watts being "crammed into a tiny space" while Ford had extra space; (3) Ladd and Watts routinely ignoring Ford when she said good morning and making "constant" comments about their "tiny two foot area"; (4) instances in which Ford's chair had been "adjusted" so that the seat pointed downward; (5) instances in which Ford's phone was unplugged; and (6) Ladd and Watts talking about Ford and writing notes to each other.  Ford also reported that that morning when she got to work, Watts had been sitting at her desk in a way that blocked Ford's access to her desk; when Ford told Watts that she could not get to her desk, Watts responded that "she couldn't help it if she had big hips."  The memorandum concluded:

> Lt., I cannot help it if I have certain disabilities.  I believe that the job duties and the environment in the visitation office are a great fit for me, and I hope that I am a great fit for this job.  My requests were simple:  an environment where the noise level wasn't too great, a desk that I could adjust for my limitations, a headset, a chair that had adjustable back and arms, and training so that my co-workers could understand the nature of my disability.  I have been subjected to repeated harassment by both of my co-clerks.  Ms. Ladd will put her phone on speaker phone when it is just the two of us, and play her music loudly when we are the only ones in the room.  Neither one will speak to me now, and they push me physically so that I have no room to move.  This creats [sic] stress which in turn is bad for my disability.  I enjoy working the visitation section, and I believe that I do a good job. I respectfully request that something be done to address these issues.

Dkt. No. 71-9.  The animosity exhibited by Ladd and Watts caused Ford stress that exacerbated her pain and caused her to leave work early on multiple occasions.

---

[15]This is referred to in Ford's statement of facts as being sent on December 4, 2014.

Later in December 2014 Ladd and Watts were transferred to a different department.[16] However, for some time both of them returned to Ford's work area and continued to harass her.

In December 2014, the MCSO changed the work schedule of all of the visitation clerks, including Ford. Visitation clerks previously worked a fixed schedule of five days on, two days off. However, many of the MCSO's employees work a schedule with rotating days off. That allows for much greater scheduling flexibility and efficiency as the MCSO, including the visitation section, operates 24 hours a day, seven days a week. By having employees work on rotating schedules, days off can be distributed fairly among the employees and the visitation area can be staffed more efficiently. On January 26, 2015, Ford requested in writing that she be permitted to return to a schedule that gave her fixed days off as an accommodation for her disability. In her request, she noted that she was not permitted to take her pain medication during work or within eight hours before going to work and that it was "very hard for me to adjust to having different days off, and that combined with the ban on taking my medication makes it difficult for me." Dkt. No. 49-1 at 22. She also expressed her belief that her schedule was changed as punishment for complaining about "the way I was being mistreated by fellow clerks." *Id.* She submitted a note from her physician in support of her request. In a written response dated February 12, 2015, Grider informed Ford that her request was denied "because it is not a reasonable accommodation." *Id.* at 26. Grider asked Ford to contact her to discuss what other options might be available. Grider also noted that the schedule of all civilian visitation

---

[16]Ford is correct that the Defendants cite to no evidence that supports their assertion that Ladd and Watts "were given disciplinary transfers . . . in response to Ford's own complaints about them." Dkt. No. 88 at 11 (citing portions of Ford's deposition which do not establish why Ladd and Watts were transferred and, indeed, indicate that Ford did not know why the transfers occurred). Accordingly, the Court has not considered that allegation, which renders that portion of Ford's Rule 56(d) motion moot.

clerks had been changed and that the change "had nothing to do with your complaint about a co-worker that was made over a year ago." *Id.*

In January 2015, a new employee, Vashni Hendricks, started working as a visitation clerk and promptly began harassing Ford "almost daily,"[17] including making jokes about Ford's disability, sometimes in front of their supervisors.

Ford reported two incidents involving Hendricks to Walterman. On January 20, 2015, she reported an incident in which she had corrected Hendricks on a work matter, after which Hendricks "was mad and did not speak to me after that. This is actually the third time that she has done that in the past week." Dkt. No. 70-21. On February 13, 2015, she reported that Hendricks had become hostile, rude, and argumentative with Ford when Ford tried to help her correct a mistake.[18]

In March or April 2015, Walterman left the visitation department and Lieutenant Teri Nesbitt became Ford's and Hendricks' new supervisor.

In June 2015, Ford reported to Sergeant Marvin Johnson that Hendricks made a comment about "getting a gun and blowing [Ford's] brains out." The MCSO investigated the report.

---

[17]Ford states in her statement of facts that "like Ladd, Hendricks immediately began harassing Ford because of her disability." Dkt. No. 133-1 at 21. None of the evidence cited by Ford for that statement actually supports it. Another paragraph in Ford's declaration states "In January 2015, Vashni Hendricks began to harass me because of my disability. This harassment continued almost daily until Hendricks was transferred out of visitation in July 2016." Dkt. No. 75-14 at ¶ 28. However, because Ford does not have personal knowledge regarding the reason Hendricks harassed her, the statement in her declaration that the harassment was "because of [Ford's] disability" is not evidence of that fact.

[18]In her statement of facts, Ford cites these reports as supporting the statement "Ford documented multiple instances to Walterman." Dkt. No. 133-1 at 21. In context, "instances" refers to either joking about Ford's disability or harassing Ford because of her disability. Neither of these reports refers to Ford's disability in any way. The third piece of evidence cited for the same proposition is an email from Ford to Walterman that states only "I am leaving now. Thanks for letting me leave early." Obviously, that also offers no support for the fact asserted.

Hendricks submitted a written response, in which she stated that she had not been referring to Ford with her comment, but was instead reacting to a news article regarding a mass shooting. While reading the article, Hendricks stated in what she thought was a "low voice," "he has blown all their brains out." Dkt. No. 49-1 at 32.

On the afternoon of June 19, 2015, Ford sent an email to Sergeant Johnson and Nesbitt with the subject line "Problematic Co-worker" which read:

> I know that when you talked to us today, you said that Ms. Hendricks was going to make an effort to get along. Well, there have been nothing but problems with her this afternoon. First, she continues to put that lotion on that is making me sick. She said that she would save it for home, but she has put it on four times this afternoon by my count.
>
> Second, we have a double visit today for [an inmate]. His mother and father are visiting him, and for some odd reason they thought that one could visit for the first fifteen minutes, then the second one could visit for the remaining time. I explained to them that it was all for both, and he countered that he had not been told before. I said that the previous time when they were allowed to split a visit had been a mistake. They were fine with that. HOWEVER, Vashni took it upon herself to argue with me about that. I told her that it was the rule when I was brought into visitation, and it remains the rule. She said that she was going to ask you. So again, she is contradicting me and asking you for information on something that she has already been told.
>
> I tried to tell her that she needed to ask any one of the FTO's about the visitation rules (Cpl. Stinson, Dep. Basso, or me). She again became argumentative, saying that she thought I was a civilian just like her. I told her that I have been an FTO for years, and that it is the reason why I have trained the other clerks. She said that well, we now have a lieutenant and a sergeant and she was just going to ask them.
>
> This continues to be a problem where she makes up her own rules and then runs to you to get you to approve them. Even Deputy White, who was in the room when I came back in, said that the visitor [sic] have to keep the visit together. I did tell her that she needs to ask either of the other FTOs if she doesn't believe me, but she said that she would ask you.
>
> Can you please talk to her again, and can you please tell her to stop using that cream that she knows is causing me a headache?

> p.s.  Deputy White was the one who first mentioned the smell earlier today, and I have not said anything to her about it, but I did (not knowing that it was her lotion) say that whatever it was, it was making me ill.

Dkt. No. 49-1 at 28.

Also on June 19, 2015, Nesbitt completed an Incident Investigation form regarding "ongoing issues" that Hendricks reported having with Ford.  Attached to the report was a lengthy typewritten list prepared by Hendricks entitled "things that has been going on with me since coming to visitation and working with Brigid Ford."  Dkt. No. 49-1 at 35-37.  The MCSO investigated this report as well.  Ford was not told that Hendricks had made a complaint about her until it was revealed to her during the meeting to discuss the complaints, while Hendricks suggested to Ford that she had seen a copy of Ford's complaint against her.[19]  During the meeting, Majors Melissa Hamblen and Deborah Sullivan told Ford that they were "not moving anyone else," and any further complaining by Ford would result in a "hit . . . in [Ford's] pocketbook."  Dkt. No. 75-14 at ¶ 31 (not ¶ 29 as cited by Ford).  From this point on, Ford felt that she "could no longer report Ms. Hendricks's harassing and hostile behavior, but Ms. Hendricks's harassing and hostile behavior continued on a nearly daily basis."  *Id.*

After the investigation was complete, on August 3, 2015, Ford received a Letter of Reprimand that stated that she had violated rules and regulations pertaining to "addressing fellow employees," "general conduct," and "conduct unbecoming."  The letter stated that "[o]n several occasions, you have been involved in arguments and disagreements with another visitation staff member" and that "[t]he constant tension and verbal disagreements have been witnessed by others and are inappropriate for the work environment."  Dkt. No. 49-1 at 43.  Hendricks

---

[19]Ford's statement of facts states that "Hendricks was provided Ford's complaint," but the testimony cited in support of that fact states only that "Vashni alluded to the fact that she had seen my complaint."  Dkt. No. 75-8 at 182.

received a Letter of Caution citing the same rules and issues. Ford received a letter of reprimand, as opposed to the letter of caution received by Hendricks, because Ford had received discipline previously, in January 2013.

On August 26, 2015, Watts came into the visitation area and falsely accused Ford of stealing her cigarettes. Hendricks "went next door and told Lieutenant Shanklin, and then [Watts] found them in her back pocket." Dkt. No. 75-8 at 23. In September 2015, Hendricks, in front of Shanklin, told Ford that Ford should have to prove that she was disabled. Shanklin responded by telling Ford that Hendricks was "just kidding" or "just joking." *Id.* at 24; Dkt. No. 75-14 at ¶ 34 (not ¶ 32 as cited by Ford).[20]

In an annual review dated December 2015, Shanklin documented that Ford met or exceeded all standards. Dkt. No. 72-3. She was described as "work[ing] well with other deputies to ensure task(s) are completed" and "always willing to assist other deputies and civilian employees with duties." *Id.* Shanklin also noted that "[w]orking with Hendricks is often still a challenge." *Id.*

In January 2016, Ford had an issue with a visitor who wanted to use a passport for identification. According to a memo she wrote about the incident, Ford asked Supervisor Marvin Johnson for assistance and he did not respond to her. Later Ford attempted to address the issue with him and asked why he had not helped her. Lieutenant Sullivan came into the office, interrupted Ford's attempt to explain her version of events, and told Johnson that "she was tired of this (or words to that effect) and that he needed to do something about it." Ford reported that visitors could hear this exchange and that she felt humiliated and embarrassed and believed "Lt.

---

[20]Ford's statement of facts includes the statement "Hendricks was never reprimanded by Shanklin for this harassing comment." Dkt. No. 133-1 at 23. That statement is not supported by the evidence cited.

Sullivan was referring to my EEOC complaint and my federal lawsuit against the department and that the hostility she displayed when she told Supervisor Johnson that she was tired of this situation and that he needed to take care of 'it' was a result of her being named in my complaint." Following this incident, Ford again tried to talk to Johnson about what had happened. At that point, Hendricks came into the office and began yelling at Johnson, then left. Ford again tried to talk to Johnson. During this conversation, Ford stood in front of Supervisor Johnson's desk and demonstrated how the visitor had flashed her passport at Ford. Major Tanesha Crear then came into the office and "said that she had seen me in front of Supervisor Johnson's desk, and that I was waving my arms around and it looked like I was yelling at Supervisor Johnson. I told both Major Crear and Supervisor Johnson that I was in a great deal of pain at that moment due to the circumstances, and Major Crear told me that she thought that anyone who was supposedly in as much pain as I was claiming to be in would not have the energy to be up in front of the Supervisor's desk, waving my arms around." Ford stated in the memo that she believed that Lt. Sullivan, Supervisor Johnson, and Hendricks were hostile to her "because of my EEOC complaint and the lawsuit that I filed in federal court last month." Dkt. No. 71-2. As a result of this incident, Crear recommended to Lieutenant Colonel Martin that Ford be suspended for sixteen hours without pay. Dkt. No. 72-20 at 3.[21] Martin, in turn,

---

[21]In a memo to Martin, Crear described Ford's actions as "less than professional" and disrespectful toward Johnson, who was her supervisor, and stated that "her body language and stance defied all boundaries of personal space" and "[h]er actions could have been interpreted as threatening and aggressive." Dkt. No. 72-20 at 2. In her discussion of this memo in her statement of facts, Ford describes Johnson as "a Hall of Fame, former three-time heavyweight champion boxer," Dkt. No. 133-1 at 23, presumably implying that it would be impossible for Johnson to be threatened in light of his history. The Court notes that the fact that Johnson (who was not actually a heavyweight, but rather a light heavyweight, which is two weight classes below heavyweight) had a very impressive boxing career as a young man in the 1970s and 1980s says absolutely nothing about Johnson's physical condition almost thirty years later. But even more fundamentally, even assuming that Johnson remains a physically imposing person, that in

recommended to Talley-Sanders that Ford be suspended for eight hours without pay. While this recommendation was approved by Talley-Sanders, it was never acted upon and has been "kept over [Ford's] head since February 2016." Dkt. No. 75-14 at ¶ 40 (not ¶ 39 as cited by Ford). There is no evidence in the record that suggests that the MCSO investigated or otherwise addressed Ford's complaint that Johnson failed to assist her with the passport issue despite her request for help.

On February 21, 2016, Hendricks "was upset and talking out loud, making vague statements about the ignorant people that I work with, she ripped up the paperwork that [Ford] had started on for the day [and] made the statement 'It's a good thing I don't have a gun.'" Dkt. No. 75-8 at 26-27. Ford reported this comment in a meeting with Captain Darrell Smith, Lieutenant Tia Shanklin, and Hendricks in late February or early March 2016. Dkt. No. 75-14 at ¶ 41.

On June 22, 2016, Ford sent the following memo to Lieutenant Shanklin:

On Tuesday, 6/21/2016 around 1400, Vashni Hendricks, who had been working in Main Control came into the visitation office to finish her day. Supervisor Johnson was sitting at his desk and Vashni started telling me about how busy she had been in Main Control and how hard she had worked. I responded that I, too had been working hard, doing all the scheduling, taling [sic] all the calls, entering all the rec information, etc. Vashni cut me off and tlld [sic] me that she needed to send me to Main Control so that I could see just how hard it was. She was laughing at the time. I tried to explain to her (again) why my disability prevents me from being able to work over there, and she interrupted me and told me that she "caught" carpal tunnel syndrome working there. I attempted to tell her why I physically am incapable of working in that environment, but she responded that she "and Janice are just going to make" me work over there "so that I" can just see how hard it is.

_____

no way means that Ford's actions (which she herself describes in her statement of facts as "passionately" explaining that she was upset with Johnson) could not reasonably have been "interpreted as threatening and aggressive" toward him by an observer. In an already oversized brief, it is unclear why Ford's counsel thought it was appropriate to include this inaccurate and irrelevant aside.

Instead of arguing with her, I took some paperwork over to another employee and left the office. When I returned she went to get the visitors. I then attempted to speak to Supervisor Johnson about what had happened. I tried to tell him that the conversation made me uncomfortable because she was making fun of my inability to work in Main Control. Supervisor Johnson replied that I needed to tell her so. I then told him that I had tried, and that he was sitting right there when I tried to speak to her. I then told him that I was coming to him as the supervisor and asked him to speak to her. He did not respond to me, and to the best of my knowledge he did not speak to her about this before going home.

I have said before that I do not feel that I have to justify to her that I am disabled and unable to do certain tasks. I do not find it funny to make jokes about my inability to do other jobs. It causes me stress which in turn causes me even more pain than I usually feel. I respectfully request that this issue be addressed.

I am also requesting that I be given some assistance and/or guidance with respect to what to do about Supervisor Johnson. I have asked for his assistance on more than one occasion and he failed to give me any help or response at all. Our rules and regulations say that we are to bring this up the chain of command, but I feel that I am being ignored in my quest for help. What can I do to rectify this situation?

Dkt. No. 71-3.

On at least two occasions, Hendricks pointed a fan in the office at Ford, even though Ford had told her that the air blowing on her skin was painful to her.

Hendricks was transferred out of the visitation department in July 2016 due to the continued conflict between Ford and Hendricks. Ford remains employed with the MCSO in the visitation clerk position and has not had any conflict with any other coworkers. In August 2016, Ford began receiving psychological treatment through the MCSO's Employee Assistance Plan. In Ford's 2016 performance review, she was again ranked as meeting or exceeding all standards.

***Civilian Employees in the Warrants Section***

As noted above, for the first nine months after returning to work on light duty, Ford worked in the warrants section where prior to her accident she had worked as a deputy sheriff serving warrants. There are both law enforcement positions and two or three civilian positions

(criminal analysts) in the warrants unit.  While Ford worked there after her accident, she was not filling one of the civilian positions; rather, she was on light duty and was doing work that was "more directed towards the needs of the officers on the street."  Dkt. No. 75-11 at 4.  However, over her time on light duty she did at some point perform each of the duties that the civilian warrants employees performed, other than things like lifting that she was physically unable to perform.  *Id.* at 5.  According to her supervisor in the warrants unit, Matthew Milharcic, Ford was well qualified for the work she was doing and her performance was very good; in fact, her experience as a deputy gave her an advantage in performing the work.[22]  Milharcic was not consulted before Ford was transferred out of the warrants unit.[23] According to Layton, the number of law enforcement and civilian employees employed as criminal analysts at any given

---

[22]Ford's statement of facts contains the statement:  "Yet MCSO denied Ford the opportunity to either stay in the position she performed as an intelligence analyst in Warrants or move to other positions for which she was qualified."  She cites the following as support for that statement: "DOE 71-72, 98-100."  "DOE 72" is Ford's 2015 performance review in which she states that she "would like a future position as a criminal analyst if the opportunity arises."  The Court tried in vain to locate DOE 71, 98, 99, or 100, only to be informed in Ford's surreply that this was a typographical error and she intended to cite to DOE 223 (Sheriff Layton's deposition) at those pages.  That deposition testimony also does not fully support the statement.

[23]Ford's statement of facts contains the statement:  "MCSO did not offer to 'civilianize' Ford's intelligence analyst position, though it did not involve law enforcement responsibilities, and Ford's compensation was already included in the budget. (DOE 223 at 71-72, 100-101)."  The designated evidence—which consists of pages from Layton's deposition—does not support the entirety of that statement. On pages 71-72, Layton explains that Ford for a time continued in her position as a deputy in the warrants section but was placed on light duty.  On pages 100-01, Layton explains that "the law enforcement personnel who worked as criminal analysts could do double duty and were utilized as double duty," meaning that they would "go out on warrants at times" when help was needed.  When asked "And she could have been given a civilianized criminal analyst job but wasn't, correct?" he answered "Obviously she wasn't.  Again, it's usually due to supply and demand and whether there was an opening.  We just can't make a slot."  When asked "[b]ut she was in a slot, right?" he responded, in relevant part, "We're talking about a person who was a deputy sheriff at the time.  And she was given, again, she was given light duty to—so she would not be in harm's way with her current physical condition. And at that time, there was not an opening for a deputy sheriff to sit at an intelligence unit and crime analyst computer."

time fluctuates and has to be "flexible and fluid" because of budgetary constraints. Dkt. No. 75-10 at 20-21.

***Ford's Applications for Other Positions***

Since moving into the visitation clerk position, Ford has applied for several open positions. In March 2016, Ford applied for a SOVO Clerk Position. She was not interviewed for the position because she had discipline on her record from the previous twelve months. It was Ford's understanding that it was MCSO's policy "for job postings to consider only discipline imposed within six months of application," Dkt. No. 75-14 at ¶ 47; however, the division commander responsible for that particular position required no disciplinary history for a year. In the summer of 2016, Ford applied for a human resources generalist position. She was interviewed but not chosen for the job. Instead "an employee named Zachary Shelton, who had been working for MCSO in Inmate Records for only four months, was given this position, even though the posting specifically required a year of employment with MCSO." Dkt. No. 75-14 at ¶ 44. In October 2016, Ford applied for an intelligence analyst position; she was denied an interview because of her "attendance history and/or discipline history." *Id.* at ¶ 45. The person chosen for the position "had only worked in Main Control for 7 years." *Id.*[24] In February 2017, Ford interviewed for two open analyst positions; she was not hired. A former prosecutor's office employee who had no experience as an analyst was chosen for one of them. *Id.* at ¶ 46. The record does not reflect who was hired for the other position.

Several civilian employees left the warrants section between February 2013 and May 2013: Kristen Belskus, who was transferred between February and March 2013; Mary Wiseman,

---

[24]In her statement of facts, Ford states that Humphrey was hired for an analyst position in February 2017. However, her declaration, which is cited for that assertion, states that Humphrey was hired for a position in October 2016.

who was transferred between April and May 2013; and Pam Forrester, who worked in the warrants section in February 2013 and apparently did not thereafter.[25]  In October 2013, there were five open positions in the warrants section (including the one that had been vacated by Ford); the record does not establish that any of them were civilian positions.  A posting for open civilian intelligence analyst positions was publicly posted in February 2015.  Ford did not apply for this position because it was a second shift position that would have been difficult for her to adjust her medication around and because it was located much further from her home.  Dkt. No. 75-14 at ¶ 24.  In June 2016, Tiffany Murphy was hired as an intelligence analyst in the warrants section.[26]  Dispatcher positions, which are paid more than Ford's current position of visitation clerk, are "open constantly."

---

[25]Ford also mentions Sherry Gehring as a civilian employee "who left Warrants on March 30, 2013," but the evidence cited is not consistent with that assertion.  For the three other employees, the evidence that they left at a particular time consists of the fact that they were no longer listed on the warrants section's telephone list after a certain time, coupled with testimony from Milharcic.  Sherry Gehring is not mentioned on the deposition pages cited and remains on the telephone list long after March 30, 2013.  There is a handwritten note on the April 2013 list that says "transfer to gangs 3/30/13," but the Court has been given no explanation regarding the source or meaning of that note.

[26]Ford states in her statement of facts that this position was never posted.  She cites to "DOE 221 at 76" for that proposition.  DOE 221 consists of excerpts of her deposition; page 76 is not included therein.  Nor are pages 74-75, which are cited for the following assertion:  "Other positions in other sections were also unposted, including a position in information, inmate records, finance, and the civil office sections."  In her surreply, Ford cites to newly submitted page 349 of her deposition for the proposition that "Ford specifically remembers no job posting for this position."  She does not actually testify that she "specifically remembers" that the job was not posted, but she does cite to the job in response to a question about "jobs you performed previously that were filled and were not posted."  The Defendants state that the position was posted; however, they cite for that assertion ¶ 19 of and Exhibit O to Grider's declaration, which relate to a position that was posted in February 2015, while Ford has pointed to evidence (Dkt. No. 72-10) that supports her assertion that Murphy was hired in June 2016.

***Marvin Johnson Receives a "Civilianized" Position***

At some point in time, Marvin Johnson "was found he could no longer meet all the requirements of being a deputy sheriff." Dkt. No. 75-10 at 7.[27] At the time, Johnson was serving as supervisor of the visitation area. His position was "civilianized," which allowed him to keep the same job at the same pay; he simply could no longer "carry a gun, make arrests, or transport inmates." *Id.* at 19. This decision was made because Johnson "could still perform the job he was in since it does not involve any law enforcement necessities," and "he was excellent in doing the job he was already doing," so the MCSO "[left] him in that position at his current salary." *Id.* at 8.

***The MCSO's Rules and Regulations Regarding Discrimination and Harassment***

Ford signed receipt of the MCSO's Rules and Regulations for Civilian Employees on December 3, 2014, which includes a section entitled "Discriminatory Acts" that reads as follows:

> No civilian employee shall discriminate against, or harass, any person on the basis of that person's race, sex, age, creed, religion, national origin, physical handicap, sexual orientation, military veteran status, or in retaliation for having filed a prior discrimination complaint.
>
> Any civil employee having reasonable cause to believe that they have been discriminated against, in violation of this section, should, as soon as possible, report the discriminatory act to the EEOC Investigator in the Human Resources Section.

Dkt. No 49-1 at 11. The following section, entitled "Procedure for Reporting Discriminatory Acts," refers only to "discriminatory Acts or harassment which pertain [sic] to race, sex, religion, military veteran status, sexual orientation or national origin." *Id.* at 12. The section after that

---

[27]The evidence is conflicting with regard to whether Johnson had a disability and whether he requested that his position be changed to a civilian position as an accommodation for that disability. Ultimately, the answer to that question—which is the main issue raised in Ford's Rule 56(d) motion—is not material to this ruling.

discusses sexual harassment. Following that is a section entitled "Protect Yourself from Sexual Harassment or Acts of Discrimination," which reads as follows:

> If you feel that you are the victim of a discriminatory act or someone in the workplace is making you feel uncomfortable because of your race, sex, age, creed, religion, national origin, physical disability, sexual orientation, military veteran status, or in retaliation for having filed a prior discrimination complaint, don't think you must either put up with it or quit. Subjecting any person to discriminatory acts or sexual harassment is illegal and the law is on your side.

*Id.* at 13. After a paragraph addressing sexual harassment, the section continues:

> If you feel uncomfortable dealing with what you perceive to be sexual harassment or discriminatory acts and want advice on what actions to take, please contact the EEO Officer in the Human Resources Section for assistance.
>
> Please understand that not only is such behavior very offensive to the MCSO, it is contrary to the rules and regulations and the Sheriff will not tolerate nor condone behavior from anyone that is deemed to be sexually harassing or discriminatory to anyone.

*Id.* at 14. The MCSO does not have a policy that refers to the Americans with Disabilities Act or that refers to "disability" rather than "physical handicap" and does not have a policy regarding making accommodations for employees' disabilities. Grider, who has been the MCSO's Director of Human Resources since 2011 and serves as the MCSO's EEO officer, has attended one seminar regarding ADA training, which was in 2010. She has received on-the-job training on the topic from MCSO Chief Deputy Eva Talley-Sanders.[28]

---

[28]Ford's statement of facts contains the following: "Talley-Sanders claims to have attended numerous workshops and seminars relating to the ADA since the 1990s, yet she believed that the ADA was passed in 1983, not 1993; and, she was not aware that the ADA had been updated since 1993. (DOE 225 at 31–36, 59, 163)." It is not clear to the Court why "yet" is used in that sentence. One could certainly attend practical seminars regarding the ADA without committing to memory when the ADA was passed or that it had been "updated" (by which Ford presumably means amended), just as one could represent clients suing under the ADA and yet mistakenly assert that it was passed in 1993, when it actually became law in 1990. *See* PL 101-336 (July 26, 1990). In addition, the evidence cited does not support the statement that Talley-Sanders "was not aware that the ADA had been updated since 1993." Rather, Talley-Sanders was asked whether she knew "when the last time the handbooks or rules and regulations, that

### III.  DISCUSSION

In Count I of her Amended Complaint, Ford asserts a claim for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), alleging that the Defendants violated the ADA by (1) failing to accommodate her by refusing to allow her to have a consistent schedule and preventing her from taking pain medication without justification; and (2) "unnecessarily mov[ing] Ms. Ford from her position in the Warrants division, even though it is also staffed by civilians, and Ms. Ford had worked there for over a year; decreas[ing] Ms. Ford's pay (and/or not provid[ing] Ms. Ford with a position with commensurate pay); refus[ing] to allow Ms. Ford to transfer to other open positions for which she was qualified; prevent[ing] Ms. Ford from changing her schedule and taking pain medication; and then disciplining Ms. Ford for reporting the behavior of other employees who harassed her because of her disability."  In Count II, she asserts a claim for retaliation, alleging that all of the acts listed above were taken in retaliation for requesting accommodations under the ADA and complaining to her supervisor when the accommodations were not granted.  The Defendants move for summary judgment on all of Ford's claims.

### A.  Failure to Accommodate

"The ADA requires employers to make reasonable accommodations that will allow a qualified individual with a disability to perform the essential functions of his or her job." *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 820 (7th Cir. 2017) (citations omitted).  Ford argues that the Defendants failed to provide her with reasonable accommodations to which she was entitled in several respects.

---

Exhibit 2, was updated regarding the Americans with Disabilities Act," to which she responded that she did not.  The question referred to MCSO's own policies, not the ADA itself.

### *1. Initial Placement in Visitation Clerk Position*

There is no question that "[r]eassigning disabled employees to vacant positions that they

can perform is a reasonable accommodation." *Id.* at 21 (citations omitted).

> Identifying reasonable accommodations for a disabled employee requires both
> employer and employee to engage in a flexible, interactive process. Both parties
> are responsible for that process. If a reasonable accommodation was available but
> the employer prevented its identification by failing to engage in the interactive
> process, that failure is actionable.

*Id.* (citations omitted).[29]

Ford argues that the Defendants failed to engage in the interactive process and, as a

result, failed to identify positions that she could have been offered that would have been better

than the visitation clerk position.[30] "[T]here is no separate cause of action for a failure of th[e]

interactive process." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014).

---

[29]Ford argues that "MCSO wrongly claims that MCSO required 'notice of Ford's disability.'" Dkt. No. 133-1 at 44 (quoting Dkt. No. 48 at 14). Ford points out (inexplicably citing an unpublished district court case, *Holland v. Methodist Hosp.*, 2016 WL 5724355, at *15 (N.D. Ind. Sept. 30, 2016), rather than any of the myriad binding Seventh Circuit cases that set forth the same test) that the "actual standard is whether MCSO was 'aware' of Ford's disability." *Id.* It is perplexing why Ford chose to include this semantic argument in her already oversized brief. Ford makes no attempt to explain the difference between "having notice of" or "being aware" of something which, frankly, is not apparent to the Court; indeed, the Seventh Circuit has used them interchangeably. *See, e.g.*, *Bellino v. Peters*, 530 F.3d 543, 549 (7th Cir. 2008) (stating that a "plaintiff must show that the employer *had notice of* his disability" while citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005), which uses "aware of"). And even if one could hypothesize a situation in which the difference could matter, it certainly does not in this case. Ford also complains that the Defendants use "refused" instead of "failed" to accommodate when setting out the standard thus "improperly add[ing] an intent element when no intent is required." Dkt. No. 133-1 at 44. This would be a reasonable point to choose to include in one's oversized brief if the Defendants in fact argued that Ford's claim failed for lack of evidence of intent, but they did not.

[30]Ford cites EEOC, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, at 40, *available at* https://www.eeoc.gov/policy/docs/accommodation.html, for the proposition that "when 'there is more than one vacancy for which the employee is qualified, the employer must place the individual in the position that comes closest to the employee's current position in terms of pay, status, etc.'" The Court notes that "the EEOC's guidelines are an important body of experience

Rather, "[i]n this area of the law, we are primarily concerned with the ends, not the means," *id.*, and "[t]he ADA seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations."[31] *Rehling v. City of Chicago,* 207 F.3d 1009, 1016 (7th Cir. 2000). Therefore, regardless of how the interactive process did or did not occur, Ford must demonstrate that the visitation clerk position was not a reasonable accommodation because there was something better available for her. *See Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856 (7th Cir. 2015), *cert. denied,* 136 S. Ct. 2399 (2016) (holding that it is the plaintiff's burden to demonstrate existence of vacant position).

Ford points to no evidence that between June and September 2013, the time during which she and the MCSO were working to find her an appropriate alternative position,[32] there was another open position that she was qualified for that would have paid more than the visitation clerk position and that she would have preferred over the position in visitation. She points to the fact that dispatch positions are "constantly" open, but she points to no evidence that she would have chosen such a position over the visitation clerk position if it had been offered to her, and it

_____

[31]Similarly, although Ford notes that Sheriff Layton testified that he believed "we would have been 100 percent legally able to dismiss her from her duties at all with the Sheriff's Office" instead of reassigning her, Dkt. No. 75-10 at 3, Layton's understanding of the law is irrelevant. If the Defendants reasonably accommodated Ford, it simply does not matter whether they understood that they were legally required to do so.

and informed judgment entitled to some deference. They are not, however, controlling law." *Equal Employment Opportunity Comm'n v. Flambeau, Inc.*, 846 F.3d 941, 948 (7th Cir. 2017) (citations omitted). Nonetheless, the Court will assume, without deciding, that the Defendants were required to offer Ford the best available vacant position for which she was qualified with or without a reasonable accommodation.

[32]Ford correctly notes that the Defendants were aware as early as March 2013 that she had a permanent disability. They did not know what Ford's physical capabilities were at that time, however, and they continued to pay Ford her full salary while they obtained the necessary medical information and had Ford undergo a fitness for duty examination.

appears that she has not applied for one of those constantly open positions since moving to visitation. She also complains that "MCSO never considered allowing Ford to remain in the Warrants section as a criminal analyst." Dkt. No. 133-1 at 40. But she fails to demonstrate that there was any such position available at the relevant time. Rather, she points to several employees who left civilian criminal analyst positions between February and May 2013, before the relevant time period. She also notes that there were five open positions in the warrants section in October 2013, but she does not point to evidence that any of them were civilian positions—that is, that they were vacated by a civilian employee or filled by one. And while Ford's statement that "[b]efore her transfer to Visitation, Ford was working in the Warrants division with essentially the same responsibilities as an intelligence analyst," *id.* at 39, is true, the evidence is undisputed that she was working at that time as a deputy on light duty status; she was not filling an otherwise open civilian position. The Defendants were not required to create a new position for her, and the fact that they essentially did so for a few months after her accident did not create an obligation for them to continue to do so.[33] *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 697 (7th Cir. 1998) (ADA "does not require that employers convert temporary 'light-duty' jobs into permanent ones"); *see also McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1165 (7th Cir.1997) ("Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position.").

---

[33]To the extent Ford argues that after she was placed in the visitation clerk position the Defendants had the obligation to continue to seek out and offer Ford any better positions that became vacant, that argument is a non-starter. Once the Defendants accommodated Ford by moving her into an appropriate vacant position and providing her with the accommodations she needed to perform that job, Ford was responsible for applying for open positions that appealed to her. *Cf. Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 857 (7th Cir. 2015), *cert. denied,* 136 S. Ct. 2399 (2016) ("Furthermore, it was Dunderdale's duty to search Skynet for job openings while he was receiving benefits on EIS, and his failure to do so does not establish that United failed to reasonably accommodate his disability.").

## 2. Medication Policy and Schedule Change

Ford also argues that the Defendants failed to accommodate her by refusing to allow her to take her pain medication within eight hours of her work shifts and by changing her schedule to one with rotating days off.   With regard to her pain medication, "[t]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches," *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000), and Ford does not point to any evidence in support of her assertion that she "made additional accommodation requests, including . . . the ability to take pain medication . . . ."  Dkt. No. 133-1 at 47.  The Defendants were not obligated to consider on their own the possible impact of each of their policies on Ford in light of her disability.  *Wells v. Winnebago Cty., Ill.*, 820 F.3d 864, 867 (7th Cir. 2016) ("[O]ur cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonableness standard to provide a specific modest accommodation." (citing *Ekstrand v. School District of Somerset,* 583 F.3d 972, 976 (7th Cir. 2009)).  Indeed, such a requirement would encourage the very type of stereotyping of disabled individuals that the ADA is designed to ameliorate.   *Cf. Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 494 (7th Cir. 2014) ("[T]the ADA does not require an employer to assume that an employee with a disability suffers from a limitation.  In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs.").

Ford did ask that she not be required to work a rotating schedule.  The Defendants argue that permitting her to work a fixed schedule would not have been a reasonable accommodation

because it would have placed an undue hardship on the MCSO.[34]  Once a plaintiff shows that the accommodation she seeks is "reasonable on its face," "the defendant has the burden to prove that the accommodation would create an undue hardship on the business."  *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) (citing *Oconomowoc Residential Programs, Inc. v. City of Milwaukee,* 300 F.3d 775, 783 (7th Cir. 2002) (in turn citing *US Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02 (2002)).  A schedule change is the type of accommodation that is reasonable on its face, "*i.e.* ordinarily or in the run of cases," *Barnett*, 535 U.S. at 402, as "modified work schedules" are expressly included in the ADA's definition of "reasonable accommodation."  42 U.S.C.A. § 12111(9).  Thus, the burden is on the Defendants to demonstrate that allowing Ford to work a fixed schedule would have been an undue hardship.

The Defendants have pointed to sufficient evidence from which a reasonable jury could find that having the visitation clerks on a schedule with rotating days off allowed for greater scheduling flexibility and efficiency than having them on a fixed schedule.  However, the Defendants have not pointed to evidence that demonstrates as a matter of law that to do otherwise would have been an "undue hardship" as that term is defined by the ADA.  *See* 42 U.S.C. § 12111(10) (defining "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)").  The Defendants point only to the assertion by Grider in her declaration that it would have been an "undue hardship" for Ford to remain on a fixed schedule while the other visitation clerks were on a

---

[34]The Defendants do not argue that Ford was not entitled to the accommodation of a fixed schedule because it was not necessary to enable her to perform her job.  *See Brumfield v. City of Chicago*, 735 F.3d 619, 633 (7th Cir. 2013) (noting that "the EEOC defines 'reasonable accommodation' to refer to workplace adjustments 'that enable an individual with a disability who is qualified to perform the essential functions of that position'") (quoting 29 C.F.R. § 1630.2(o)(1)(ii)).

rotating schedule because that "could not be done efficiently." Putting aside the fact that whether something is an "undue burden" is a legal conclusion and the Defendants fail to point to evidence in the record to support it, this statement also mischaracterizes Ford's requested accommodation. Ford asked that she be allowed to continue (or to return to) working a fixed schedule. The Defendants point to no evidence that putting all of the visitation clerks back on a fixed schedule would have been an undue hardship. The rotating schedule may have been more efficient and flexible, but the Defendants have not pointed to evidence that continuing to use a fixed schedule would have required the type of significant difficulty or expense required by § 12111(10). Accordingly, the Defendants' motion for summary judgment is **DENIED** with regard to the question of whether they violated the ADA by refusing to allow Ford to work a fixed schedule as a reasonable accommodation for her disability.

### B. Disability Discrimination

The ADA prohibits discrimination against an employee on the basis of the employee's disability. 42 U.S.C. § 12112(a). To survive summary judgment on this claim,[35] Ford must point to evidence from which a reasonable jury could conclude that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) the Defendants took an adverse job action against her; and (4) the adverse action was caused by her disability. *See, e.g., Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016).[36]

---

[35]Ford does not invoke the alternative *McDonnell Douglas* burden-shifting method of surviving summary judgment in an employment discrimination case.

[36]As noted in *Roberts*, "It remains an open question whether the 2008 amendment to the ADA, which changed the statute's causation language from 'because of' to 'on the basis of,' altered the substantive standard." 817 F.3d at 565 n. 1 (citing *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 287 n. 3 (7th Cir. 2015)). Like the court in *Roberts*, the Court finds that "[s]ince

The Defendants argue that Ford did not suffer any adverse employment action. In response, Ford argues that because the visitation clerk position to which she was transferred paid less than her deputy position, the transfer was an adverse action. While a demotion can certainly be an adverse employment action, to the extent that Ford was "demoted," it was because she could no longer perform the essential functions of her deputy position, with or without a reasonable accommodation.[37] And, as discussed above, Ford points to no evidence that at the relevant time there was another open position that she was qualified for that would have paid more than the visitation clerk position and that she would have preferred over the position in visitation. Therefore Ford has not demonstrated that she suffered an adverse action for ADA purposes when she was given a position as a visitation clerk.

The only other adverse action asserted by Ford is that she was "denied promotions and transfers, and these positions were provided to employees with less experience and less seniority with MCSO." Dkt. No. 133-1 at 32. "Failure to promote can be an adverse action giving rise to liability, but the plaintiff must first show that she properly applied for the position." *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (citations omitted). Ford has offered evidence that she applied for four positions, which the Court will assume would have been promotions for her. The entirety of the evidence that she points to with regard to those positions is set forth *infra*. She points out what she perceives as deficiencies in the experience of some of the applicants who were chosen over her, but she does not provide any evidence of what type of experience the decision makers believed to be important. She does not point to any evidence to refute the

_____

the particular causation standard does not affect the outcome of this case and neither party argues that another standard should apply, we continue to apply the pre–2008 causation standard."

[37]Ford's argument that her position should have been "civilianized" as an accommodation is discussed in the context of her failure to accommodate claim.

Defendants' assertion that her disciplinary and/or attendance record was legitimately considered in some of the decisions or that she was not otherwise the best candidate for the job. She has not even pointed to any evidence that the particular decision makers knew that she was disabled, or indeed even that the people who were chosen for the jobs over her were not disabled themselves. In other words, Ford has not come close to pointing to evidence from which a reasonable juror could determine that she was not hired for any of those positions because of her disability. Accordingly, the Defendants are entitled to summary judgment on Ford's ADA discrimination claim.

## C. Retaliation

As with her discrimination claim, to survive summary judgment on her claim for retaliation under the ADA Ford must show that she engaged in statutorily protected activity, that she suffered an adverse employment action, and that there is a causal connection between the two. *See, e.g.*, *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015). Ford asserts that she was subjected to the following adverse actions:

a. Demoting Ford to a position that was an entry-level position, with a significant pay cut, when that position was meant only to be temporary;

b. Refusing to promote and/or transfer Ford to positions for which she was well-qualified; and

c. Forcing a significant loss in comp time due to the actions of other MCSO employees as well as time spent adjusting to her new schedule and working without pain medication.

Dkt. No. 133-1 at 49. With regard to the first two, Ford's retaliation claim fails for the same reasons as her discrimination claim. As for the third, any loss of comp time due to working without pain medication or a change in her schedule would be a result, not an action; the actions would be the application of the pain medication policy and the schedule change, and Ford points

to no evidence from which a reasonable juror could conclude that those were acts of retaliation, rather than the application of general MCSO policies to her. At the summary judgment stage, it is up to counsel to connect the dots between the facts of record and the law with regard to each alleged claim; "[i]t is not this court's responsibility to research and construct the parties' arguments," *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011), and "'[p]erfunctory and undeveloped arguments are waived.'" *Lauth v. Covance, Inc.*, 863 F.3d 708, 718 (7th Cir. 2017) (quoting *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 n.6 (7th Cir. 2002)). Finally, any loss of comp time due to "the actions of other MCSO employees" also is a result; the action would be creating or allowing a hostile work environment. Ford's hostile work environment claim is discussed below; there is no separate claim for creating or allowing a hostile work environment in retaliation for protected activity. The Defendants therefore are entitled to summary judgment on Ford's claim for retaliation.

### D. Hostile Work Environment[38]

Finally, Ford alleges that she was subjected to a hostile work environment because of her disability. "A hostile-work-environment claim requires proof of four elements: (1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's [disability] was the

---

[38]The Court notes that the Seventh Circuit has "not decided whether allowing a hostile work environment is actionable under the ADA." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009) (citing *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005)); *see also Shott v. Rush Univ. Med. Ctr.*, 652 F. App'x 455, 458 (7th Cir. 2106), *cert. denied,* 137 S. Ct. 592 (2016) (citing *Lloyd* as "declining to decide whether hostile work environment claim is actionable under the ADA"); *Mashni v. Bd. of Educ. of City of Chicago*, No. 15 C 10951, 2017 WL 3838039, at *9 (N.D. Ill. Sept. 1, 2017) (recently noting that "[t]he Seventh Circuit has yet to decide this issue"). As set forth in detail in *Mashni*, "[i]n recent years, more and more circuits have explicitly recognized hostile work environment claims under the ADA: and [n]o circuit has held that these claims are *not* available under the ADA." *Id.* The parties in this case assume that such a claim is cognizable and that the applicable law is the same as that under Title VII. The Court agrees with the *Mashni* court's well-reasoned holding that both of these assumptions are correct.

cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for

employer liability." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016), *cert.*

*denied,* 137 S. Ct. 1115 (2017) (citation omitted).

> In determining whether a workplace is objectively hostile, we consider the totality
> of the circumstances, including: the frequency of the discriminatory conduct; its
> severity; whether it is physically threatening or humiliating, or a mere offensive
> utterance; and whether it unreasonably interferes with an employee's work
> performance. The specific circumstances of the working environment and the
> relationship between the harassing party and the harassed also bear on whether
> that line is crossed. Still, this liability has limitations, and [the ADA] was not
> designed to become a general civility code. Instead, although a workplace need
> not be "hellish" to constitute a hostile work environment, a hostile work
> environment must be so pervaded by discrimination that the terms and conditions
> of employment are altered.

*Alamo v. Bliss*, 864 F.3d 541, 549-50 (7th Cir. 2017) (internal citations and quotation marks

omitted).[39]

The Defendants argue that the conduct described by Ford is not sufficiently severe or

pervasive to constitute a hostile work environment. The Court has set forth above in great detail

the evidence pointed to by Ford regarding her work environment. Viewing the evidence in the

light most favorable to Ford, the Court finds that a reasonable jury could find that the conduct

---

[39]In their reply brief, the Defendants cite to *Logan v. Kautex Textron North Am.*, 259 F.3d
635 (7th Cir. 2001), for the proposition that "[t]he workplace that is actionable is the one that is
hellish." Dkt. No. 88 at 15. As quoted above, the Seventh Circuit subsequently has stated that a
workplace does not have to be "hellish" to be actionable, and, in fact, has chastised counsel for
so stating, *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007) ("We trust that in the
future counsel will avoid the use of a single, overwrought word like 'hellish' to describe the
workplace."), despite the fact that the Seventh Circuit itself used the term in that context on more
than one occasion. *See, e.g.*, *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 645 (7th Cir. 2005)
("Indeed, the threshold for plaintiffs is high, as '[t]he workplace that is actionable is one that is
"hellish."'" (quoting *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997)). As
these cases have not been overruled, it was not improper for the Defendants to cite to *Logan* for
the proposition, but given the Seventh Circuit's more recent pronouncements on the subject, the
Court suggests that the term be retired.

described by Ford rises to the level of an actionable hostile work environment, at least for some periods of time.

The Defendants also argue that Ford has failed to show a basis for employer liability. With regard to co-worker harassment, an employer "is liable only if it was 'negligent either in discovering or remedying the harassment.'" *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011)). Viewing the evidence in the light most favorable to Ford, the Court finds that a reasonable jury could so find with regard to the period of time before Ladd and Watts transferred out of the visitation department. The Court has set forth in detail the evidence of record regarding Ford's complaints to Walterman, her supervisor, during that time period; the jury reasonably could determine that those complaints put the Defendants on notice that Ford was experiencing harassment based on her disability and that the Defendants were negligent in failing to stop it sooner.[40]

However, the Court finds that Ford has not pointed to evidence from which a reasonable jury could find a basis for employer liability by Hendricks, her co-worker after Ladd and Watts left the visitation department. While Ford made many complaints about Hendricks, an examination of the evidence pointed to by Ford shows that prior to June 22, 2016, none of those complaints put the Defendants on notice that Ford perceived Hendricks' actions as harassment based on her disability. Rather, the earlier complaints involved Ford and Hendricks clashing over work issues and Hendricks making comments that did not reference Ford's disability. Ford also complained that Hendricks used lotion that "made her ill," but she points to no evidence that

---

[40]The Defendants suggest that they cannot be liable because Ford failed to follow their procedure for reporting harassment. The Defendants do not adequately develop this argument for it to be considered by the Court.

sensitivity to lotion smell is a result of her disability or, if it is, that the Defendants were aware of that fact. Ford also points to a time in September 2015 when Hendricks remarked in front of Shanklin, a supervisor, that Ford should have to prove that she was disabled and Shanklin responded by telling Ford that Hendricks was "just kidding" or "just joking." As a matter of law, that isolated incident alone is not sufficient to support a finding that the Defendants knew or should have known that Hendricks was subjecting her to a hostile work environment due to her disability.

On June 22, 2016, Ford sent a memo to Shanklin in which she described comments made by Hendricks about her disability and asked that the issue be addressed. Hendricks was transferred out of visitation the following month. The Court finds that based on the facts of record, no reasonable jury could find that the Defendants were negligent in failing to discover or remedy disability-based harassment by Hendricks.

Finally, Ford points to Major Crear's comment in January 2016 that someone "supposedly in as much pain as [Ford] was claiming to be in would not have the energy to be up in front of the Supervisor's desk, waving [her] arms around" as part of the hostile work environment she was subjected to. However, Ford made a lengthy report to Shanklin about that incident, and she did not mention that she believed she was being harassed because of her disability, either generally or in that instance; rather, she stated in the memo that she believed that Lt. Sullivan, Supervisor Johnson, and Hendricks were hostile to her "because of my EEOC complaint and the lawsuit that I filed in federal court last month." Dkt. No. 71-2. Therefore, the Defendants were not negligent for failing to investigate the possibility of a hostile work environment on the basis of that complaint.

# IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (Dkt. No. 47) is **DENIED** as to Ford's failure to accommodate claim based on her request for a fixed work schedule and as to Ford's hostile work environment based on harassment by co-workers Ladd and Watts. The motion is **GRANTED** in all other respects. The Plaintiff's motion to file a surreply (Dkt. No. 102) is **GRANTED** and the **CLERK IS DIRECTED** to file the surreply (found at Dkt. No. 102-1). The Plaintiff's Verified Motion for Rule 56(d) Relief (Dkt. No. 108) is **DENIED**. Finally, the Plaintiff's motion to file an oversized brief (Dkt. No. 133) is **GRANTED** and the **CLERK IS DIRECTED** to file the amended response to the motion for summary judgment (found at Dkt. No. 133-1).

One final note. As discussed above in footnote 14, the Defendants assert that the City of Indianapolis is not a proper defendant in this case. If this is so, it is unclear to the Court why the City did not move for summary judgment on that ground. The parties are encouraged to discuss whether this is an issue on which an agreement can be reached prior to trial.

SO ORDERED: 9/20/17

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification